IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MWK RECRUITING, INC., | § | |
| Plaintiff, | § § § | |
| v. | § | 1:18-CV-444-RP |
| EVAN P. JOWERS, | § § § | |
| Defendant. | § § | |
| EVAN P. JOWERS, | § § | |
| Counterplaintiff, | § § § | |
| v. | § § | |
| MWK RECRUITING, INC., ROBERT E. KINNEY, RECRUITING PARTNERS GP, INC., KINNEY RECRUITING, LLC, COUNSEL UNLIMITED, LLC, and KINNEY RECRUITING LIMITED, | § § § § § § § | |
| Counterdefendants. | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 7 and 8, 2021, the Court held a bench trial in this matter. (Dkts. 338, 339). The parties submitted post-trial briefs. (Pl. Br., Dkt. 342; Deft. Br., Dkt. 343). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following findings of fact and conclusions of law.

### I. BACKGROUND

The issues in this case stem primarily from an employment dispute between Defendant/Counterplaintiff Evan P. Jowers ("Jowers") and Plaintiff/Counterdefendant MWK Recruiting, Inc. ("MWK"). Beginning in April 2006, Jowers worked as a legal recruiter for MWK

Exhibit 1 to Original Complaint   1                                Page 1 of 44

and its associated entities,[1] which are all lead by Robert E. Kinney ("Kinney"). (Second Am. Compl., Dkt. 80, at 2–6; Third Am. Answer, Dkt. 237, at 40). In 2006, shortly after he was hired, Jowers signed an Associate Recruiter Employment Agreement ("Jowers Agreement"), which includes non-compete and non-solicitation covenants. (Jowers Emp't Agreement, Dkt. 80-1). Jowers resigned from MWK on December 16, 2016. (Tr. I, at 149).

During his employment, Jowers originally recruited attorneys for placements at large law firms based in the United States and United Kingdom, but around 2015 he relocated to Hong Kong to place attorneys with law firms in Asia. (Second Am. Compl., Dkt. 80, at 14). In December 2016, Jowers ended his employment with Kinney Recruiting HK and joined Legis Ventures as an attorney recruiter. (Second Am. Compl., Dkt. 80, at 14). MWK alleges that Jowers submitted six MWK candidates through Alejandro Vargas ("Vargas"), the founder of Legis Ventures, while he was still employed with MWK. (Id). Specifically, MWK alleges that Jowers sent Kinney an email stating Jowers had submitted candidates named James Chang, Longhao Zhang, Richard Han, Pamela U, Claudia Lau, and Xiao Zhang through Vargas. (Id).

Jowers also obtained two loans related to his employment in 2012. First, Jowers entered into a Forgivable Loan Agreement and Promissory Note (the "Forgivable Loan"). (Id. at 6). Second, Jowers entered into a Loan Agreement and Promissory Note (the "Revolving Loan"). (Id. at 8). As of the date of Jowers's resignation, Kinney alleges Jowers still owed money on both loans (Id. at 43, 44). For his part, Jowers alleges that, despite promising to do so, MWK refused to reimburse him for work related expenses in Hong Kong, refused to provide him with a Hong Kong work visa, and failed to provide an office location and housing costs in Hong Kong. (Third Am. Answer, Dkt. 237, at 51, 54–55). Jowers also asserts that the Jowers Agreement provided that he would receive certain

---

[1] Jowers worked for Kinney Recruiting, L.P., (P-2, Dkt. 341-1, at 3), then Recruiting Partners GP, Inc., and then its affiliate, Kinney Recruiting, LLC. (Second Am. Compl., Dkt. 80, at 2–6). Recruiting Partners GP, Inc. is a Texas corporation and the predecessor entity of MWK. (Id. at 2, 9).

Exhibit 1 to Original Complaint                    Page 2 of 44

commission amounts for placing attorney candidates, but that these commission rates were unilaterally reduced after commissions were earned. (*Id.* at 54).

## II. SUMMARY OF THE EVIDENCE

During the trial, the Court heard testimony from Kinney, Jowers, and Alexis Lamb. (Dkt. 340). The Court also entered exhibits provided by both parties. (Dkt. 341).

### A. Misappropriation of MWK's Trade Secrets

In its complaint, MWK alleges that Jowers misappropriated MWK's trade secrets related to information about law firm clients and attorney candidates (Second Am. Compl., Dkt. 80, at 24, 32–36). MWK brings these claims under both the Federal Defend Trade Secret Act ("FDTSA"), and the Texas Uniform Trade Secret Acts ("TUTSA"). At trial, Kinney testified that Jowers misappropriated MWK's trade secrets by utilizing confidential information he'd obtained during his final year of employment with MWK to place six candidates at law firms in the year following his departure from MWK. (Tr. I, at 77). Those candidates included Steve Kang ("Kang"), James Chang ("Chang"), Rose Zhu ("Zhu"), Pamela Usukumah ("Usukumah"), Longhao Wang ("Wang"), and Meng Ding ("Ding"). (*Id.* at 157).

Kinney testified that he became aware that Jowers was working with Wang, Chang, and Usukumah through an email Jowers sent to him following his departure from MWK, which stated he had been sent the three names "right before I left Kinney." (*Id.* at 50; P-53, Dkt. 341-2, at 2). An email from Jowers through his Kinney Recruiting email address shows that he began making contacts with firms on behalf of Rose Zhu in October of 2016. (P-20, Dkt. 341-1, at 150). Kinney further testified that he did not find out about Jowers's work with Kang and Ding until he issued

Exhibit 1 to Original Complaint                    Page 3 of 44

subpoenas during discovery and found that Jowers had been communicating with these candidates through a personal email address while working at MWK. (Tr. I, at 45–47, 121).

Kinney testified that the Jowers Agreement included nondisclosure clauses. (*Id.* at 144). The clauses state:

> At all times during and after the Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure or use may be required in connection with the Employee's employment, or unless the Robert Kinney expressly authorizes such in writing.

(P-2, Dkt. 341-1, at 6–7).

> For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

(*Id.* at 7). Kinney testified that he did not give Jowers any authorization in writing permitting him to utilize or disclose the information obtained about the six candidates. (Tr. I, at 144).

Regarding what Kinney considers to be proprietary information regarding MWK's candidates, he stated "their identity," "information about them" that is "not readily ascertainable by people." (*Id.* at 158). This information could include specifics about deals clients had made, how much experience clients had, clients' law school information, why and where clients would want to move, and what their most confidential desires about their future employment were. (*Id.* at 166). He testified that recruiters at MWK establish trust and confidence relationships in order to place candidates, relationships which take a long time to develop. (*Id.* at 158–59). Kinney stated that the information MWK gathers about candidates in order to build trust and make placements is, therefore, a valuable business asset and offers MWK significant competitive advantages against other recruiting businesses that do not have the same information. (*Id.* at 159). On cross-examination, Kinney noted that he wasn't sure if a candidate's name alone constituted a trade secret.

Exhibit 1 to Original Complaint                              Page 4 of 44

(*Id.* at 216). Jowers testified that the confidential information he gathered from the candidates was based on his own personal relationships with the candidates and that MWK did not take measures to protect the information at issue, nor did Kinney ever tell him he needed to keep information secret. (*Id.* at 213–14).

The parties provided specific evidence regarding the alleged trade secret misappropriation for each of the six candidates. Regarding Kang, Jowers first met Kang while working for MWK. (Tr. II, at 139–41; 242–44; P-130, Dkt. 341-4, at 734). Jowers testified that, before leaving MWK, he obtained information regarding Kang's desire to transfer firms and sent an email to Latham & Watkins regarding Kang's candidacy from his personal email address. (Tr. II, at 247). After leaving MWK, as early as December 14, 2016, Jowers continued to communicate with Latham & Watkins about Kang, including information about Kang's clients and how much Kang's practice was worth. (P-57, Dkt. 341-2, at 9). Jowers testified that he believed Kinney would "blow up the whole deal" if he involved Kinney in the placement of Kang at Latham & Watkins. (Tr. II, at 147–48). Kang was ultimately hired by Latham & Watkins and Jowers received a placement fee. (P-130, Dkt. 341-4, at 724).

Chang emailed back and forth with Jowers in December 2016 to set up a phone conversation. (P-20, at 169–70). On December 14, 2016, Chang emailed Jowers, expressed his interest in changing firms, and listed his clients. (P-59, at 66). On December 23, 2016, Kinney emailed Chang and asked him if he had heard from Jowers. (*Id.* at 65). On March 7, 2017, Jowers emailed the law firm DLA Piper to put forward Chang's candidacy. (P-61, Dkt. 341-2, at 67). In the email, Jowers discusses Chang's language abilities, his "stellar" end-of-year reviews, his desire to

Exhibit 1 to Original Complaint                    Page 5 of 44

move back to China, his deal sheet and clients, and his resume. (*Id.*). Chang was ultimately hired by

DLA Piper, and Jowers was paid a placement fee. (P-126, Dkt. 341-4, at 642).

Jowers began sending information about Zhu out to firms as early as October 20, 2016 using

his MWK email address. (P-20, Dkt. 341-1, at 150). In his emails, Jowers details how much Zhu's

practice was worth and her client list. (*Id.*). Following his resignation, Jowers continued to send

emails to law firms on behalf of Zhu, containing the same information he had sent to firms while

working at MWK. (P-63, Dkt. 341-2, at 93; P-64, Dkt. 341-2, at 96; P-65, Dkt. 341-2, at 99). The law

firm Baker & McKenzie hired Zhu "on or about May 17, 2017," and paid a placement fee to Jowers

for her placement. (P-122, Dkt. 341-4, at 590).

Jowers became aware of Wang's interest in changing firms while working at MWK. (P-53,

Dkt. 341-2, at 5) (referring to Wang as "Longhao Zhang"). Before Jowers left MWK, Alejandro

Vargas ("Vargas") began sending out emails to law firms about Wang's candidacy. (P-69, Dkt. 341-2,

at 136). When Jowers left MWK, he and Vargas started their own recruiting firm. (Tr. I, at 152).

Vargas's emails included Wang's language skills, law school record, and reasons for changing firms

and moving to China. (*Id.*). On January 5, 2017, Kinney sent an email to Wang, stating that "by

cooperating with" Jowers, Wang was "being put in a position where [Wang was] assisting [Jowers] in

converting [Kinney's] proprietary information . . . ." (D-341, Dkt. 341-8, at 29). Wang "ended up

moving to Skadden's Hong Kong offices in 2017" without Jowers's help. (P-143, Dkt. 341-1, at 976;

Tr. II, at 153 (Jowers testifying that Wang "was placed by another recruiter because he was afraid"

of Kinney and that Jowers found out about Wang's placement at Skadden "just like the public finds

out")). In 2018, Jowers assisted Wang in getting hired by Latham & Watkins and Jowers was paid a

placement fee. (P-130, Dkt. 341-1, at 726).

Usukumah emailed MWK in June 2016 to request that MWK assist her with her job search

in Asia, and her email was forwarded to Jowers. (P-71, Dkt. 341-3, at 1). In her email, Usukumah

6

Exhibit 1 to Original Complaint                    Page 6 of 44

listed her language skills, discussed what she was looking for in a job, and noted that she was working with other recruiting services but wasn't getting enough traction. (*Id.*). In November 2016, Usukumah emailed Jowers her resume, corporate deal sheet, and law school transcript. (P-72, Dkt. 341-3, at 3). On December 14, 2016, shortly before Jowers resigned from MWK, Vargas began reaching out to law firms on behalf of Usukumah with emails that included Usukumah's interest in moving to Asia, her resume, her deal sheet, and her transcript. (P-73, Dkt. 341-3, at 4). In the email, Vargas states that he has "known [Usukumah] for about 6 months, as she reached out to me then . . . ." (*Id.*). In January 2017, Vargas received feedback from a law firm on Usukumah's candidacy and forwarded the email to Jowers. (P-74, Dkt. 341-3, at 6). Around that same time, Usukumah forwarded Jowers an email she had received from Kinney in which Kinney stated "I don't want to complicate your life or your search, but if you listen to Evan and do not get in touch with me, you will be in an awkward position . . . At the very least, I'd like to help you avoid getting in the middle of a battle between Evan and his old company, something that could get you deposed, or worse." (D-337, Dkt. 341-8, at 26). When Usukumah forwarded this email to Jowers, she stated "I really, really do not want my search to be adversely affected by this . . . . At the very least, should I confirm that I did want to continue representation with you as my recruiter after you had left Kinney?" (*Id.* at 25). Jowers ultimately succeeded in getting Usukumah placed at a law firm in Singapore in August 2017 and received a placement fee. (Tr. II, at 251; P-132, Dkt. 341-4, at 773–74).

Finally, Jowers began working on marketing Ding for in-house positions around July 2016 while Jowers was working at MWK. (P-78, Dkt. 341-3, at 21). However, Jowers determined that Ding's situation at his current firm had improved, and believed that Ding may not be in a hurry to change jobs. (*Id.*). After Jowers resigned from MWK, he had an email exchange with Ding using his new company's email account. (P-77, Dkt. 341-3, at 20). In the email exchange, Ding sent Jowers his resume and deal list and requested that Jowers keep them in the strictest confidence, which Jowers

Exhibit 1 to Original Complaint                    Page 7 of 44

agreed to do. (*Id.*). In July of 2017, Jowers reached out to a law firm on behalf of Ding and included information about Ding's clients, his interests, and his goals for a potential move. (P-80, Dkt. 341-3, at 35). Jowers also included Ding's resume and deal sheet, which he stated was last updated in December 2016. (*Id.* at 36). The law firm Kirkland & Ellis hired Ding in November 2017 and paid Jowers a placement fee. (P-129, Dkt. 341-4, at 708).

### B. Breach of the Jowers Agreement

MWK's next claim alleges that Jowers breached provisions in the Jowers Agreement, which is governed by Florida law, (*see infra* Part III.B). (Second Am. Compl., Dkt. 80, at 39). The trial evidence shows that after beginning to work with MWK, Jowers became interested in expanding the company's work in Asia. (Tr. I, at 63; Tr. II, at 165–69). Kinney testified that he believed the company's expansion into Asia would be expensive. (Tr. I, at 64–65). In August 2006, Jowers sent an email to Kinney that said "[s]ince you are investing money in me . . . I would be happy to sign a non-compete to give you peace of mind. I guess that is always an issue that you would be dealing with in building up a recruiting company." (P-17, Dkt. 341-1, at 97). The parties agree that the Jowers Agreement was fully executed in December 2006. (Pl. Br., Dkt. 342, at 98–99; Deft. Br., Dkt. 343, at 2). MWK alleges Jowers breached the confidentiality and non-solicitation covenants in the Jowers Agreement. (*Id.*)

The Jowers agreement included clauses intended to maintain confidentiality of MWK's proprietary information. (P-2, Dkt. 341-1, at 4). In particular, the clauses at issue state:

> 3.2    The employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in the strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

8

Exhibit 1 to Original Complaint                    Page 8 of 44

(*Id.*) (Clause 3.2). [2]

> 4.4    The employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

(*Id.* at 5) (Clause 4.4).

> 8.1    For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

(*Id.* at 7) (Clause 8.1).

> 9.1    The actual damages resulting from violation of Sections 7 and/or 8 of this Agreement by the Employee will be difficult or impossible to ascertain. In the event of such a violation, the Employee shall pay the Company, upon demand, as liquidated damages, and not as a penalty, the following:
>> 9.1.1    Any fee paid for services rendered in violation of Sections 7 and/or 8, whether paid to the Employee or to any other person, firm or entity; plus
>> 9.1.2    All costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation.

(*Id.*) (Clauses 9.1, 9.1.1, 9.1.2).

---

[2] The agreement defines "Proprietary Information" as:

> [T]he Company's confidential information, including but not limited to client and candidate lists, interim employees, personal information supplied by candidates and interim employees, information concerning the identity of clients and their personnel, the personnel and partnership needs and requirements of clients, terms and conditions under which the Company deals with clients, billing rates, profit margins, financial data, applications, resumes, candidate and employee data sheets, job orders, search assignments, planners, invoices, manuals, computer programs and data, Company personnel information, audio and video cassettes, records, and any information received from a client or candidate under an expectation of confidentiality. The terms "customer list" and "candidate list" are not limited to physical writings or compilations. "Customer lists" and "candidate lists' include information contained in or reproduced from the memory of an employee. The Company's Proprietary Information includes all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets.

(*Id.*) (Clause 1.6).

Exhibit 1 to Original Complaint                    Page 9 of 44

> 9.4    The one-year time periods referred to in Section 8 shall be extended to include any period of time during which the Employee engages in activities constituting a violation of that Section.

(*Id.*) (Clause 9.4).

The contract notes that these restrictive clauses are intended to protect MWK's business interests, stating that "[t]he protection of the Company's Proprietary Information, good will, and relationships with its clients and candidates is vital to the continued successful operation of the Company's business." (*Id.* at 4) (Clause 3.3). Kinney testified that this clause was intended to acknowledge that MWK would "expend considerable time and money procuring and training [employees], providing facilities for the conduct of its business, and establishing relationships and goodwill with existing and prospective clients and candidates." (Tr. I, at 87).

At trial, MWK argued that Jowers breached clauses 3.2 and 4.4 of the contract prior to leaving MWK. (Pl. Br., Dkt. 342, at 26–27). Specifically, MWK provided evidence that Jowers secretly sent candidate information to law firms and to Vargas while still employed at MWK. *See supra* Part II.A (describing how Jowers sent information about Kang, Wang, and Usukumah to law firms and Vargas using a personal email while working at MWK). MWK also argued that Jowers breached clause 8.1 of the contract. The trial evidence shows Jowers had contact with each of the following law firm clients of MWK between December 17, 2015, and December 16, 2016 using his MWK email address: Allen & Overy (P-20, Dkt. 341-1, at 156); Cleary, Gottlieb, Steen, & Hamilton (*id.* at 109); Cooley (*id.* at 99); Covington & Burling (*id.* at 123); DLA Piper (*id.* at 159); Gibson, Dunn & Crutcher (*id.* at 163); Kirkland & Ellis (*id.* at 152); Latham & Watkins (*id.* at 138); Linklaters (*id.* at 150); Morrison & Foerster (*id.* at 162); Skadden, Arps, Slate, Meagher & Flom (*id.* at 131), and Weil, Gotshal & Manges (*id.* at 155). While Jowers told candidates he would send their information to the law firms Baker & McKenzie and Gunderson Dettmer, there is no evidence in the record that

**Exhibit 1 to Original Complaint**                    **Page 10 of 44**

Jowers was actually in contact with these firms during his last year at MWK. (P-20, Dkt. 341-1, at 112–21; *id.* at 133–37).

Jowers also had contacts with the following candidates during his last year at MWK: Zhu, Chang, Ding, Kang, Wang, Usukumah (*see supra* Part II.A); Kevin Cooper ("Cooper") (P-20, Dkt. 341-1, at 101); Ferish Patel ("Patel") (*id.* at 122); Ingram Weber ("Weber") (*id.* at 132); Nicole (Wenhan) Ma ("Ma") (*id.* at 123–30); Jason (Jiaxing) Xu ("Xu") (*id.* at 138–39); Benjamin Su ("Su") (*id.* at 138); and Amit Singh ("Singh") (*id.* at 156–57).

The evidence presented at trial likewise shows that Jowers solicited or provided personnel placement services to the above-mentioned firms and candidates following his departure from MWK.[3] Specifically, he pitched candidates to the law firm Weil, Gotshal & Manges on April 19, 2017, March 15, 2018, July 17, 2020, and November 16, 2020, (P-21, Dkt. 341-1, at 176, 185–86, 202–03), and the law firm Latham & Watkins on March 14, 2018 and October 21, 2019 (*id.* at 178, 183–84, 196–201). He also placed Zhu, Chang, Ding, Kang, Wang, Usukumah, Cooper, Patel, Weber, Ma, Xu, Su, and Singh on the following dates:

| Candidate Name | Placement |
|---|---|
| Zhu | Baker & McKenzie<br>May 17, 2017<br>(P-122, Dkt. 341-4, at 590) |
| Chang | DLA Piper<br>August 1, 2017<br>(P-126, Dkt. 341-4, at 642) |
| Ding | Kirkland & Ellis<br>November 16, 2017<br>(P-129, Dkt. 341-4, at 708) |
| Kang | Latham & Watkins<br>June 28, 2017<br>(P-130, Dkt. 341-4, at 724) |
| Wang | Latham & Watkins<br>September 24, 2018<br>(P-130, Dkt. 341-1, at 726 |

---

[3] Jowers assists with each of the placements that are made by his current recruiting firm. (Tr. II, at 128–30).

Exhibit 1 to Original Complaint                    Page 11 of 44

| Usukumah | Morrison & Foerster<br>August 1, 2017<br>(Tr. II, at 251; P-132, Dkt. 341-4, at 773–74) |
| Cooper | Cooley<br>March 20, 2020<br>(P-124, Dkt. 341-4, at 614–15) |
| Patel | Cooley<br>July 29, 2019<br>(P-124, Dkt. 341-4, at 612–13) |
| Weber | Allen & Overy<br>May 16, 2018<br>(P-121, Dkt. 341-4, Dkt. 577–78) |
| Ma | Covington & Burling<br>September 13, 2017<br>(P-96, Dkt. 341-3, at 100) |
| Xu | Gibson, Dunn & Crutcher<br>July 23, 2018<br>(P-127, Dkt. 341-4, at 655–66) |
| Su | Latham & Watkins<br>March 14, 2018<br>(P-130, Dkt. 341-4, at 727–28) |
| Singh | Linklaters<br>December 20, 2018<br>(P-131, Dkt. 341-4, at 763) |

Jowers also placed candidates at the following firms on the following dates:

| Firm Name | Placement |
| --- | --- |
| Weil, Gotshal & Manges | September 20, 2017, (P-134, Dkt. 341-4, at 807)<br>April 6, 2020, (P-134, Dkt. 341-4, at 808) |
| Allen & Overy | July 31, 2018, (P-121, Dkt. 341-4, 579) |
| Cleary, Gottlieb, Steen & Hamilton | October 24, 2017, (P-123, Dkt. 341-4, at 602) |
| Cooley | October 4, 2019, (P-124, Dkt. 341-4, at 614)<br>January 30, 2020, (P-124, Dkt. 341-4, at 616) |
| DLA Piper | January 8, 2020, (P-126, Dkt. 341-4, at 646) |
| Gibson, Dunn & Crutcher | June 24, 2019, (P-127, Dkt. 341-4, at 657)<br>August 12, 2019, (P-127, Dkt. 341-4, at 672)<br>September 23, 2019, (P-127, Dkt. 341-4, at 658) |
| Morrison & Foerster | January 30, 2018, (P-132, Dkt. 341-4, at 775)<br>December 6, 2018, (P-132, Dkt. 341-4, at 777)<br>March 20, 2019, (P-132, Dkt. 341-4, at 777)<br>April 18, 2019, (P-132, Dkt. 341-4, at 779)<br>June 17, 2019, (P-132, Dkt. 341-4, 782) |

Exhibit 1 to Original Complaint                    Page 12 of 44

| | |
|---|---|
| Skadden, Arps, Slate, Meagher & Flom | April 20, 2018, (P-133, Dkt. 341-4, at 729) <br> November 4, 2019, (P-133, Dkt. 341-4, at 794) <br> November 12, 2019, (P-133, Dkt. 341-4, at 795) |
| Gunderson Dettmer | March 6, 2017, (P-128, Dkt. 341-4, at 683) <br> August 14, 2017, (P-128, Dkt. 341-4, at 682) <br> April 18, 2018, (P-128, Dkt. 341-4, at 684) <br> February 26, 2019, (P-128, Dkt. 341-4, at 686) <br> May 7, 2019, (P-128, Dkt. 341-4, at 687) <br> August 5, 2019, (P-128, Dkt. 341-4, at 689) <br> April 13, 2020, (P-128, Dkt. 341-4, at 691) <br> May 2, 2020, (P-128, Dkt. 341-4, at 693) |
| Baker & McKenzie | May 17, 2017, (P-122, Dkt. 341-4, at 591) |
| Latham & Watkins | August 24, 2017, (P-130, Dkt. 341-4, at 726) <br> April 20, 2018, (P-130, Dkt. 341-4, at 729) <br> April 20, 2018, (P-130, Dkt. 341-4, at 728) <br> August 24, 2017, (P-130, Dkt. 341-4, at 727) <br> July 16, 2018, (P-130, Dkt. 341-4, at 729) |
| Kirkland & Ellis | October 3, 2017, (P-129, Dkt. 341-4, at 705) <br> November 2, 2017, (P-129, Dkt. 341-4, at 706) |
| Linklaters | December 20, 2018, (P-131, Dkt. 341-4, at 761) <br> March 25, 2019, (P-131, Dkt. 341-4, at 754) <br> March 25, 2019, (P-131, Dkt. 341-4, at 758) <br> April 9, 2019, (P-131, Dkt. 341-4, at 760) <br> November 21, 2019, (P-131, Dkt.341-4, at 756) |

Jowers asserts several defenses to his liability under the Jowers Agreement. In his Third Amended Answer, Jowers asserts that Kinney threatened not to pay Jowers his commissions unless he signed the Jowers Agreement. (Dkt. 237, at 33). At trial, Jowers testified that Kinney did not physically threaten him to sign the agreement, but that he "felt that [the Jowers Agreement] was signed under duress and that [he] had to sign it in order to not be robbed" of his income "and to avoid bankruptcy." (Tr. II, at 139–40).

Jowers also asserts that MWK and Kinney materially breached the Jowers Agreement prior to any breaches by Jowers. (Dkt. 237, at 33). The record suggests that the breaches Jowers alleges relate to Kinney changing Jowers's commission rate following the execution of the Jowers Agreement in 2006. When Jowers signed the agreement in 2006, he was subject to a base pay of

Exhibit 1 to Original Complaint                    Page 13 of 44

$3,000 monthly plus commissions, which were "45% of the first $75,000; 50% of the next $75,000; 55% of the next $75,000; 60% of the next $75,000; 65% of the excess over $300,000." (P-2, Dkt. 341-1, at 11). Throughout Jowers's employment, MWK instituted changes to Jowers's commission structure. (*See* D-49, Dkt. 341-5, at 18 (changing commission structure to "45% across the board"); Tr. II, at 191 (Jowers testifying that he was comfortable with his commissions going to "62.5 percent across the board"); (P-158, Dkt. 341-4, at 1119) (email from Kinney to Jowers stating Jowers's commissions would stop at 50%, and Jowers's response: "I don't think it is fair that I am only getting 50% as the checks come in"); P-159, Dkt. 341-4, at 1121 (Jowers acknowledging email from Kinney stating Jowers would get 45 percent for any placement)). At trial, Jowers testified, "I didn't think I can have – my commissions could just be lowered to 45 percent, but he told me that I had like an hour to decide. He's doing payroll and if I don't say yes, I'm fired basically." (Tr. II, at 196).

Jowers also alleges that the restrictive covenants clauses are overbroad, overlong, not reasonably necessary, and unconscionable. (Dkt. 237, at 34, 36). He asserts the restrictive covenants are overbroad in both scope and geographic area, overlong because of the tolling requirement, not reasonably necessary to protect MWK's business interests, and unconscionable because they "purport to restrain Defendant's ability to earn a living worldwide for an indefinite period of time." (*Id.* at 34–36). Kinney testified at trial that "[t]he confidential information that we have . . . could easily be of value for more than a year, but one year was a compromise . . . to establish a reasonable level of protection." (Tr. I, at 81–82). He further testified that the restrictive covenant "only affects ability to work in placement of personnel at a business, which means for our client list, which is predominantly law firms, and some corporations, you could do other things for them. You could create war rooms, or do discovery work, or utilize your relationships in another way for that year period, but you had to stay out of the personnel placement service business" or "the employee has the option of limiting their access to certain clients or candidates -- for example, I don't want to see

14

Exhibit 1 to Original Complaint                    Page 14 of 44

any new candidates. I'm just going to work with my old candidates -- in order to limit the effect of the non-solicitation agreement." (*Id.* at 83–84). When Jowers's attorney asked Kinney, "[s]o [Jowers] can't work anywhere in the world?" Kinney responded, "[t]hat's not a correct statement." (Tr. II, at 49).

In addition, Jowers argues that the liquidated damages clause does "not explain why [MWK] should be entitled to 100% of the gross revenue generated by a third party entities Legis Ventures, Jowers Vargas LLC, or Jowers Langers LLC – entities that are not parties in these proceedings, even though they are the only parties that were paid" the fees for the above-mentioned placements. (Deft. Br., Dkt. 343, at 8) (*see also* P-2, Dkt. 341-1, at 7; Tr. I, at 183). [4] In short, Jowers argues, MWK failed to prove that the placements were made by Jowers or caused MWK any harm, as there is no proof MWK would have made these same placements. (P-2, Dkt. 341-1, at 19).[5]

Finally, Jowers asserts that argues that Hong Kong law should govern the Jowers Agreement instead of Florida law. In an email from Kinney to Jowers on January 28, 2009, Kinney stated that "[t]he noncompete will be amended to apply to Hong Kong/China and be fully enforceable." At trial, Kinney testified that, around 2009, he was trying to get a Hong Kong work permit for Lamb: "I gave our people that were trying to get her a work permit our existing contract, and I remember they suggested some changes to it and that the provisions that they suggested were different from

---

[4] The Court has previously found that Jowers waived his right to challenge the liquidated damages clause. (Dkt. 285, at 21–22). However, the Court will address Jowers's argument here, as it is principally concerned with causation.

[5] In Jowers's Third Amended Complaint, he asserts additional defenses, including (1) failure to state a claim, (Dkt. 237, at 33); (2) fraud, (*id.* at 34); (3) waiver, (*id.*); (4) estoppel, (*id.*); lack of consideration, (*id.* at 35); rescission, (*id.*); and unclean hands, (*id.*). The Court denied summary judgment to Jowers as to all of Plaintiff's claims, (Dkt. 80), and thus declines to revisit any arguments for failure to state a claim. (Dkt. 285). The Court also disposed of Jowers's fraud argument in its Motion for Judgment on the Pleadings. (Dkt. 229, at 7–14). While Jowers subsequently filed an amended answer, he included the same language from his fraud defense in his previous answer, which the Court had already dismissed. (Dkt. 237, at 34). Further, Jowers failed to testify or direct the Court to any evidence regarding his defenses of waiver, estoppel, lack of consideration, rescission, or unclean hands, nor did he mention the defenses in his post-trial briefing. The Court therefore declines to rule in Jowers's favor based on these defenses.

Exhibit 1 to Original Complaint                    Page 15 of 44

the Florida law provisions that were contained in" the Jowers Agreement. (Tr. I, at 199–200). Lamb testified that Hong Kong non-compete agreements differ from Florida non-compete agreements in that they are required to have a "garden leave" provision. (Tr. III, at 15–24). Specifically, Lamb testified that employees must be paid their salary during the period in which their employment contract restrains their mobility. (*Id.*). Jowers asserts that without a specific Hong Kong employment agreement, the non-compete in the Jowers Agreement should not apply to him. (Deft. Br., Dkt. 343, at 10).

In addition, Jowers asserts that there *was* a Hong Kong contract and that he reasonably relied on it to his detriment. On August 7, 2015, Kinney sent an email to a Hong Kong law firm with a draft employment agreement, stating "[o]nce these documents are in good form we can arrange to have [Jowers] sign them." (D-130, Dkt. 341-5, at 45). Jowers testified that he believed this contract was required to contain a garden-leave provision and that Kinney was imminently going to sign the contract. (Tr. II, at 227). Kinney testified that he told Jowers he had concerns and was uncomfortable signing the Hong Kong agreement in Fall 2015. (Tr. II, at 30–31).

### C.  Loan Agreements

#### 1. 2012 Forgivable Loan

On February 1, 2012, Jowers entered into the Forgivable Loan. (P-5, Dkt. 341-1). The Forgivable Loan was intended to be an "extra reward" for Jowers. (P-37, Dkt. 341-1, at 473). When describing the loan to Jowers, Kinney stated, "whatever I do for you I plan to structure as a forgivable loan so that you will not have to pay tax on the money immediately . . . . The term will be nine years . . . . The downside is that if you were to split in 9 years, you'd have to pay me back." (*Id.*). Jowers responded, "Sure, it is great for me to get a nice deserved bonus, but not worth it for you if someone in my shoes takes a big bonus after a great year and then splits[.]" (*Id.*). The Forgivable Loan has an associated promissory note of $50,000, which is signed by Jowers as the debtor. (P-5,

Exhibit 1 to Original Complaint                    Page 16 of 44

Dkt. 341-1, at 22). The promissory note states that it shall be "exclusively governed by, and construed and enforced in accordance with, the laws of the State of Texas." (*Id.*). The terms of the Forgivable Loan stated that "upon Employee's termination of employment with the Company for any reason, any outstanding Principal Amount will be immediately due and payable." (*Id.* at 18).

When Jowers left MWK in December 2016, the balance of the Forgivable Loan was $25,982.18 with a 1.17 percent simple interest per annum, which Jowers does not dispute. (Tr. II, at 100). MWK therefore seeks damages in the amount of $25,982.18 plus interest growing at 78.7 cents per day since December 6, 2021, as well as attorney fees and costs. (Tr. I, at 182). Kinney testified that Jowers has made no payments on the loan since he left MWK. (Tr. I, at 181). Jowers testified that he feels the loan should have been considered a "bonus," (Tr. II, at 99).[6] In his Third Amended Answer, Jowers also asserts MWK "coerced [him] into signing the [Forgivable Loan Agreement] by threatening to terminate Defendant and withhold all pending commissions," and that the MWK's claim for breach of the Forgivable Loan agreement is barred because of MWK's prior material breaches of its obligations under the contract. (Dkt. 237, at 33).

### 2. 2012 Revolving Loan

MWK and Jowers entered into the Revolving Loan on December 29, 2012. (P-9, Dkt. 341-1, at 32). Both parties signed the agreement. (*Id.* at 48–49). The Revolving Loan had an associated promissory note of $150,000, which Jowers signed as the debtor. (P-8, Dkt. 341-1). The Revolving Loan also had an associated security agreement, which Jowers also signed as the debtor. (P-10, Dkt. 341-1). The loan had a per annum interest rate of 17 percent. (P-8, Dkt. 341-1, at 26). Jowers testified that he authorized charges to the Revolving Loan, which were presented to him in

---

[6] In response, Kinney testified: "So if you're deciding whether to give somebody a bonus, you can either pay them in cash, in which case, they have an immediate tax hit and you have to risk that that person's going to take that cash and leave, and then, you get nothing out of that and they also have less disposable cash, than if they got a loan. So if you structure it as a loan and then, you forgive it over a period of time, you can solve that problem." (Tr. II, at 41).

Exhibit 1 to Original Complaint                    Page 17 of 44

accountings he received each pay period. (Tr. II, at 102). Kinney testified that Jowers has not provided his own accounting of what is due on the loan. (Tr. I, at 150–51).

The parties dispute the amount that is due on the loan. Jowers asserts that MWK's accountings of the loan balance have changed throughout the course of this litigation. Specifically, Jowers alleges that MWK initially plead that Jowers owed $48,535.98 under the loan when he resigned, (Tr. I, at 230), even though MWK's accountant Renee Sommers ("Sommers") told Jowers when he resigned that the line of credit had been paid back. (P-51, Dkt. 341-2, at 1) (email from Sommers saying "Yes, I think the remaining regular bonus and Hui Xu commission will just cover the remaining balance, might be a few hundred short."). Kinney testified that the balance on the date of Jowers's resignation was $48,535.98, but that MWK is only seeking "$14,000 roughly as of this date." (Tr. I, at 230). Kinney further testified that this discrepancy is due to MWK applying the commission Jowers received after his departure for the placement of candidate Hui Zhu to Jowers's loan balance. (*Id.* at 55, 231). Kinney testified that the balance Jowers owed at the end of January 2017 was $8,001.84, and with the addition of the 17 percent interest per annum, the total amount Jowers owes on the loan as of December 6, 2021 is $14,690.04 plus interest growing a $3.78 per day since that date. (*Id.* at 176–78; P-165, Dkt. 341-4, at 1131). Jowers argues that this accounting is inconsistent with the Sommers's accounting that Jowers was "maybe a couple hundred dollars" short on the loan when he left MWK. (Deft. Br., Dkt. 343, at 14).

The trial evidence demonstrates that at the time of his resignation, Jowers also owed $30,000 on an interest-free loan that was given to him to cover housing expenses in Hong Kong. (Tr. I, at 39–41; P-39, Dkt. 341-1, at 494). Jowers asserts that upon his resignation, MWK converted the $30,000 interest-free loan to be part of the Revolving Loan with a 17 percent interest rate. (P-327, Dkt. 341-8, at 24). Kinney testified that he did not transfer the amount Jowers owed under the $30,000 interest-free loan to the interest-bearing loan; instead, he states that $30,147.85 was withheld

Exhibit 1 to Original Complaint                    Page 18 of 44

from Jowers's last paycheck, and that $30,000 of that money was applied to pay off the interest-free loan, while the other $147.85 was applied to help pay of the Revolving Loan. (Tr. II, at 6). MWK's summary of its accounting for the Revolving Loan does not show the addition of $30,000 to Jowers's balance under the Revolving Loan. (P-165, Dkt. 341-1, at 1131).

In addition to Jowers's defense that Sommers confirmed he paid off the Revolving Loan, (Dkt. 237, at 36), Jowers also asserts that MWK "coerced [him] into signing the [Revolving Loan Agreement] by threatening to terminate Defendant and withhold all pending commissions," and that the MWK's claim for breach of the Revolving Loan is barred because of MWK's prior material breaches of its obligations under the contract. (Dkt. 237, at 33).

### 3. Assignment of Employment and Loan Agreements

In addition to his specific objections to MWK's claims under the Jowers Agreement, Forgivable Loan, and Revolving Loan, Jowers also asserts that all three agreements are void because the agreements were transferred and assigned between different entities without notice to Jowers. (Deft. Br., Dkt. 343, at 9–11, 20). Each of the agreements permitted assignments. The Jowers Agreement specifically stated, "The parties to this Agreement expressly authorize that the restrictive covenants contained herein be enforceable by the Company's assignees and/or successors." (P-2, Dkt. 341-1, at 9). The Forgivable Loan does not prohibit assignment of the Agreement, nor does it require notice of any assignment to be provided to Jowers. (P-5, at 22). The Revolving Loan states "This Agreement is made for the sole protection of Debtor and Lender, and Lender's successors and assigns." (P-9, Dkt. 341-1, at 44).

The evidence demonstrates that, effective January 1, 2007, Kinney Recruiting, L.P. assigned the Jowers Agreement to Recruiting Partners GP, Inc. (P-4, Dkt. 341-1, at 16). Jowers received notice that the entity he was employed by had changed through his W-2. (P-15, Dkt. 341-1, at 88). As of October 16, 2012, Recruiting Partners GP, Inc. assigned the Jowers Agreement to Kinney

Exhibit 1 to Original Complaint                    Page 19 of 44

Recruiting, LLC. (P-7, Dkt. 341-1, at 24). Jowers received notice that the entity he was employed by had changed through his W-2. (P-15, Dkt. 341-1, at 91–92). The Forgivable Loan was initially issued by Recruiting Partners GP, Inc., (P-5, Dkt. 341-1, at 17), and was assigned to Kinney Recruiting, LLC on October 16, 2012. (P-7, Dkt. 341-1, at 24). The Jowers Agreement and Forgivable Loan were transferred to MWK on January 31, 2017. (P-11, Dkt. 341-1, at 73). Finally, the Revolving Loan was initially issued by Counsel Unlimited, LLC, and on January 31, 2017, Counsel Unlimited, LLC assigned the loan to MWK. (P-12, Dkt. 341-1, at 74). Therefore, as of January 31, 2017, MWK was the owner of the Jowers Agreement, Forgivable Loan, and Revolving Loan. Jowers testified that he has never personally seen any of these assignments. (Tr. II, at 198).

### D.  Hui Xu Commission

In his Third Amended Answer, Jowers asserts that he was retroactively denied commissions he had already earned. (Dkt. 237, at 53–54). Although the Court initially granted summary judgment to MWK on this claim, (Dkt. 285, at 12), the Court later determined that a genuine fact issue existed as to the payment of Jowers's commission of $41,009 for a candidate named Hui Xu ("Hui"). (Dkt. 314, at 8). Kinney testified that the Hui commission was applied to Jowers's balance under the Revolving Loan. (Tr. I, at 172). Specifically, Kinney testified that when MWK realized Jowers had breached the restrictive covenants in the Jowers Agreement, MWK felt that it could hold "back his commissions to be applied to potential breaches of the employment agreement[.]" (*Id.* at 173). Kinney Recruiting, LLC (the owner of the Jowers Agreement) assigned its interest in the Jowers Agreement to MWK on January 31, 2017. (*Id.*). That same day, Counsel Unlimited, LLC assigned the Revolving Loan to MWK. (P-12, Dkt. 341-1, at 74). As Kinney testified, as of January 31, 2017, MWK was both the assignee of the Jowers Agreement and the commission money it had held back pursuant to it, as well as the assignee of the Revolving Loan. (*Id.* at 174). Once the Hui commission and the Revolving Loan had a consolidated owner, Kinney applied the Hui commission to the

Exhibit 1 to Original Complaint                    Page 20 of 44

balance Jowers owed under the Revolving Loan. (*Id.*). The evidence also shows that Jowers expected the Hui commission to be applied to his Revolving Loan balance. (P-51, Dkt. 341-2, at 1).

### E.  Hong Kong Expenses

Jowers's second counterclaim is that MWK made Jowers charge business expenses to the Revolving Loan. (Deft. Br., Dkt. 343, at 15). Specifically, Jowers alleges MWK made him pay for housing in Hong Kong, even though Jowers testified that he worked 24-7 out of his apartment. (Tr. II, at 130). The Jowers Agreement states that "The Company will pay all of the usual and ordinary expenses involved in the operation of the Office." (P-2, Dkt. 341-1, at 4). Kinney testified at trial that housing does not qualify under "expenses" in the Jowers Agreement since they are not "usual and ordinary." (Tr. I, at 239–40). Kinney testified that he has sole discretion as to what business expense is "usual and ordinary." (*Id.* at 242). Kinney testified that in 2015, MWK, charged Jowers's housing expenses to the Revolving Loan, but that MWK paid off the balance as a bonus to Jowers and backdated the interest. (Tr. I, at 245). This process prompted Kinney to create the $30,000 interest-free loan so that MWK could loan Jowers money for housing without interest. (*Id.* at 245). However, Kinney also testified that some of Jowers's housing costs were charged to the Revolving Loan in 2016. (Tr. II, at 17). Those charges were for $10,720 on August 11, 2016, $5,314.63 on September 25, 2016, and $10,309.93 on October 18, 2016. (D-327, Dkt. 341-8, at 24). The evidence appears to demonstrate that these were charged to the Revolving Loan because Jowers had used up the $30,000 limit on the interest-free loan by July of 2016. (*Id.*).

### III. DISCUSSION

### A.  Misappropriation of MWK's Trade Secrets

MWK brings its trade secrets claims under both the Federal Defend Trade Secret Act ("FDTSA"), and the Texas Uniform Trade Secret Acts ("TUTSA"). District Courts consider "federal and state trade secret misappropriation claims together because they will likely require proof

Exhibit 1 to Original Complaint                    Page 21 of 44

of the same elements." *StoneCoat of Tex., LLC v. Procal Stone Design, LLC*, 426 F. Supp. 3d 311, 339

(E.D. Tex. 2019); *Lifesize, Inc. v. Chimene*, No. 1:16-CV-1109-RP, 2017 WL 1532609, at *8 n.4 (W.D.

Tex. Apr. 26, 2017).

### 1.   Trade Secrets

Under both the DTSA and TUTSA, a trade secret is defined as information the owner has

taken reasonable measures to keep secret and which derives independent economic value from not

being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code

§ 134A.002(6); 18 U.S.C. § 1839(3). "A trade secret is any formula, pattern, device or compilation of

information which is used in one's business and presents an opportunity to obtain an advantage over

competitors who do not know or use it." *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 274 (5th Cir. 2009)

(quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). "It differs from

other secret information in a business in that it is not simply information as to single or ephemeral

events in the conduct of the business. . . . A trade secret is a process or device for continuous use in

the operation of the business." *Id.* (quoting Restatement of Torts § 757, cmt. B.). To determine

whether a trade secret exists, courts examine several factors:

> (1) the extent to which the information is known outside of his business; (2) the
> extent to which it is known by employees and others involved in his business; (3) the
> extent of the measures taken by him to guard the secrecy of the information; (4) the
> value of the information to him and to his competitors; (5) the amount of effort or
> money expended by him in developing the information; (6) the ease or difficulty with
> which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

The Court finds that the information that Jowers gathered regarding clients and potential

clients of MWK's recruiting business falls under the categories of information that Texas courts

have considered to be trade secrets. *See, e.g., Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417,

441 (S.D. Tex. 2008) ("Customer lists, pricing information, client information, customer preferences,

buyer contacts, and marketing strategies have all been recognized as trade secrets."); *Nova Consulting*

Exhibit 1 to Original Complaint                    Page 22 of 44

*Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, No. CIV. SA03CA305FB, 2005 WL 2708811, at *10 (W.D.

Tex. June 3, 2005), *report and recommendation adopted*, No. SA-03-CA-0305-FB, 2005 WL 8156326

(W.D. Tex. Sept. 28, 2005) ("[Plaintiff] seeks trade secret status for information it has obtained

about clients and client contact persons as well as for the relationships [plaintiff] has developed with

those clients and contacts. . . . [T]he relationships developed with client contacts was not generally

known or readily accessible to its competitors.").

      In a similar situation to the information at issue here, "Texas courts consistently consider

three factors when determining whether a customer list is a trade secret: (1) what steps, if any, an

employer has taken to maintain the confidentiality of a customer list; (2) whether a departing

employee acknowledges that the customer list is confidential; and (3) whether the content of the list

is readily ascertainable." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003). All of

MWK's employees who access the company's proprietary information are required to sign an

agreement with confidentiality provisions, such as the Jowers Agreement, which MWK enforces

through legal redress when applicable. (P-2, Dkt. 341-1, at 6–7). Thus, MWK has demonstrated that

Jowers would have known the information was confidential and that MWK attempted to keep the

information it learned about candidates and clients confidential. *See Nova Consulting Grp., Inc. v. Eng'g

Consulting Servs., Ltd.*, No. CIV. SA03CA305FB, 2005 WL 2708811, at *10 (W.D. Tex. June 3, 2005),

*report and recommendation adopted*, No. SA-03-CA-0305-FB, 2005 WL 8156326 (W.D. Tex. Sept. 28,

2005) ("There is evidence [plaintiff] attempted to protect the information relevant to its [client]

relationships by[] having employees sign agreements containing nondisclosure covenants."). In

addition, information about potential candidates that other recruiting firms also had access to can

still be considered a trade secret. *See also Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 625–26

(S.D. Tex. 2011) ("Even if the information is readily available in the industry, it will be protected if

the competitor obtained it working for the former employer.").

Exhibit 1 to Original Complaint          Page 23 of 44

The Court finds that the information Jowers gathered as to Kang, Zhu, Usukumah, Ding, Chang, and Wang—including their names, their clients, how much their practices were worth, their language skills, their goals for switching firms, and their law school records—constituted MWK's trade secrets. *See supra* Part II.A. The evidence supports that Jowers received and acted on this information about these clients while he was working at MWK. *Id.* Further, Jowers was under an obligation to maintain the privacy of these candidates through the Jowers Agreement and through the nature of the recruiting business, which depends on establishing long-term trust relationships with clients. (Tr. I, at 158–59). Indeed, several of these candidates specifically requested that their information be kept in confidence, and Jowers himself declined to disclose to Kinney that he was working with Kang, Ding, and Zhu after he left MWK. *See supra* Part II.A.

In his Third Amended Complaint, Jowers argues that the information he gained about the six candidates was not a trade secret, because it was "readily ascertainable by proper means." (Dkt. 237, at 36). However, Jowers's own testimony belies the argument that this information was readily ascertainable, as he testified repeatedly about his clients' desires to keep their information secret and that much of the information he was able to gather about the six candidates was because he had long-time relationships with them. (*See* Tr. II, at 154 ("[The information Jowers had about Kang] couldn't be monetized or used by any other recruiter if they had it because you can't just take this and throw it into some system and start making placements."); *id.* at 214 ("[Client information is] highly confidential sensitive information that clients provide and you can't let that get out in the public."); *see also* P-77, Dkt. 341-3, at 20 (email from Ding asking Jowers to keep his information "in strict confidence")).

### 2.   Misappropriation

The Court turns next to whether Jowers misappropriated MWK's trade secrets as to Kang, Zhu, Usukumah, Ding, Chang, and Wang. Misappropriation under both statutes includes (1)

Exhibit 1 to Original Complaint                          Page 24 of 44

"disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Tex. Civ. Prac. & Rem. Code § 134A.002(3); 18 U.S.C. § 1839(5). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(2); 18 U.S.C. § 1839(6)(A). A defendant can be liable for misappropriation of trade secrets if, at the time of the unauthorized use or disclosure of the information, the defendant knew he obtained the information under circumstances giving rise to a duty to maintain its secrecy. Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(ii)(b); *see also HIS Co. v. Stover*, 202 F. Supp. 3d 685, 696 (S.D. Tex. 2016).

The Court has already found that Jowers was aware of his obligation to maintain the confidentiality of the information he received from Kang, Zhu, Usukumah, Ding, Chang, and Wang while he was employed at MWK. Therefore, the Court must assess whether Jowers engaged in the unauthorized use or disclosure of that information. The evidence demonstrates that Jowers did not receive Kinney's permission to disclose the information Jowers had gathered about Kang, Zhu, Usukumah, Ding, Chang, and Wang while Jowers worked at MWK. (*See* P-53, Dkt. 341-2, at 2; Tr. I, at 45–47, 121).

The evidence further demonstrates that Jowers shared the information he learned about these candidates while at MWK with Vargas and law firms seeking to hire the candidates. (Tr. II, at 247; P-57, Dkt. 341-2, at 9) (detailing the information Jowers shared with Latham & Watkins about Kang while Jowers still worked at MWK); (P-20, Dkt. 341-1, at 150; P-63, Dkt. 341-2, at 93; P-64, Dkt. 341-2, at 96; P-65, Dkt. 341-2, at 99) (showing that Jowers's emails to law firms regarding Zhu both before and after his resignation from MWK contain much of the same information); (P-53, Dkt. 341-2, at 5; P-69, Dkt. 341-2, at 136) (demonstrating that Jowers was aware of Wang before he

Exhibit 1 to Original Complaint                    Page 25 of 44

left MWK, and that Vargas—Jowers's eventual business partner—was emailing firms about Wang

before Jowers left MWK); (P-71, Dkt. 341-3, at 1; P-73, Dkt. 341-3, at 4) (showing that Usukumah

worked with Jowers at MWK during the last of 2016 and that Vargas began sending out emails on

Usukumah's behalf shortly before Jowers resigned); (P-78, Dkt. 341-3, at 21; P-77, Dkt. 341-3, at 20)

(demonstrating that Jowers began market Ding to potential employers while he was working with

MWK and continued to work on placing Ding at a firm following his resignation). This evidence

supports a finding that Jowers disclosed trade secrets he had gathered about Kang, Zhu, Usukumah,

Ding, Chang, and Wang without MWK's authorization.

　　　In his Third Amended Complaint, Jowers asserts that he "did not misappropriate any MWK

trade secrets because Defendant independently developed the information MWK alleges he

misappropriated." (Dkt. 237, at 36). Jowers testified in support of the independent relationships he

built with candidates through his work:

> Q: Is it fair to say that you cared deeply about your candidates?
> A: Yes.
> Q: In fact, if I asked you, do you think it's fair to say that you remember your entire
> career since you entered the legal recruiting field in 2005, do you think it's fair to say
> that you can remember every placement more or less that you did an didn't make?
> A: Most of them.
> Q: This is your passion, is it not?
> A: It is. Yeah.
> Q: These people that you place, these attorneys, they rely on you for advice, right?
> A: It's a privilege, yes.
> Q: They rely on you for mentorship?
> A: Yes.
> Q: You care about what happens to them?
> A: Yes.

(Tr. II, at 244–45). While the Court does not doubt that Jowers's relationships with the six

candidates at issue here were personal and individualized, building relationships with candidates was

also a requirement of his job as a recruiter for MWK. In other words, he was required to develop

these relationships in order to fulfill his job description and requirements. And, despite the parties'

disagreements over the extent to which MWK supported Jowers in developing these relationships,

Exhibit 1 to Original Complaint                    Page 26 of 44

the evidence demonstrates that MWK invested resources that provided Jowers with the opportunity to work with Kang, Chang, Usukumah, Ding, Wang, and Zhu. (P-36, Dkt. 341-1) (Jowers's paystubs showing $90,883.63 in expense reimbursements). Thus, the Court declines to rule in Jowers's favor on this basis.

### 3.   Damages

"Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret[;] the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a 'reasonable royalty.'" *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 879 (5th Cir. 2013). They can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not considered in computing actual loss. Tex. Civ. Prac. & Rem. Code § 134A.004(a). "Estimation of damages should not be based on sheer speculation. If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable." *StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 352 (E.D. Tex. 2019).

MWK alleges that it is owed damages based on the "total amount of fees earned by Jowers and his company" for the placement of the abovementioned candidates. MWK also seeks exemplary damages, attorney fees, and costs. The Court will assess damages against Jowers for his actual profits from the use of the trade secrets as to Kang, Zhu, Usukumah, Chang, and Ding. *See Wellogix*, 716 F.3d at 879. Jowers received 1,342,492 Hong Kong Dollars for the placement of Kang on August 7, 2019, (P-130, Dkt. 341-4, at 725); 453,600 Hong Kong Dollars for Zhu on March 14, 2018, (P-93, Dkt. 341-3, at 53); 458,893 Hong Kong Dollars for Usukumah on August 1, 2017, (P-102, Dkt. 341-4, at 27); 979,765 Hong Kong Dollars for Ding on January 8, 2018, (P-129, Dkt. 341-4, at 12); and 798,034 Hong Kong Dollars for Chang on December 12, 2017. (P-126, Dkt. 341-4, at 643). On

Exhibit 1 to Original Complaint                    Page 27 of 44

April 27, 2022, the Court granted MWK's motion for judicial notice of the exchange rate between the Hong Kong Dollar and the United States Dollar. (*See* Text Order, 4/27/2022). Applying the exchange rates on the relevant dates, the Court will grant MWK damages in the amounts of $171,172.91 for Kang, $57,919.94 for Zhu, $58,741.31 for Usukumah, $125,270.42 for Ding, and $102,221.62 for Chang, totaling $515,326.20.

The Court will not assess damages against Jowers for the misappropriation of MWK's trade secrets as to Wang. While Jowers did share confidential information about Wang with Vargas without authorization, Wang chose not to proceed with recruiting services from either MWK or Jowers and "ended up moving to Skadden's Hong Kong offices in 2017" without Jowers's help. (P-143, Dkt. 341-1, at 976; Tr. II, at 153 (Jowers testifying that he found out about Wang's placement at Skadden "just like the public finds out")). It was not until 2018, during a separate job search, that Jowers assisted Wang in getting hired by Latham & Watkins. (P-130, Dkt. 341-1, at 726). There is no evidence in the record that the information Jowers relied on to place Wang at Latham & Watkins was the same information he garnered about Wang while at MWK—indeed, the information was likely different, as Wang had worked at Skadden for a year before his job search with Jowers.

The Court likewise will not assess exemplary damages or attorney fees and costs. Exemplary damages are available "if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence. *Thomas v. Hughes*, 27 F.4th 995, 1008 (5th Cir. 2022) (citing Tex. Civ. Prac. & Rem. Code § 41.003(a)). Whether or not to award exemplary damages is within the Court's discretion. *See Brady v. State of Lousiana*, 998 F.2d 1013 (5th Cir. 1993) ("We review a punitive damages award for abuse of discretion."). A court may award attorney fees to the prevailing party in a claim for misappropriation of trade secrets under the TUTSA and FDTSA if the misappropriation is "willful and malicious." Tex. Civ. Prac. & Rem. Code § 134A.005(3); 18 U.S.C. §

Exhibit 1 to Original Complaint                                    Page 28 of 44

1836(b)(3)(D). The evidence presented at trial supports a finding that at least some of the candidates at issue here were long-time friends of Jowers or specifically requested Jowers's assistance with their job search after he left MWK. (*See, e.g.*, Tr. II, at 148–52; D-337, Dkt. 341-8, at 25–26). Further, certain candidates affirmatively chose not to work with MWK after Kinney reached out to them following Jowers's departure. (*See, e.g., id.*; P-143, Dkt. 341-1, at 976; Tr. II, at 153). For these reasons, the Court declines to use its discretion to award exemplary damages or attorney fees and costs. The Court will thus assess damages against Jowers for the misappropriation of MWK's trade secrets in the amount of $515,326.20.

## B. Breach of the Jowers Agreement

As a threshold matter, the Court will address Jowers's argument that Hong Kong law should be applied to the Jowers Agreement. First, the Court notes that it granted MWK summary judgment as to Jowers's claims for promissory estoppel, including his claim that he relied on MWK's promise "that Jowers's employment would not be subject to a non-solicitation agreement[.]" (Dkt. 237, at 54–55; Dkt. 285, at 12 n.4) ("Jowers's complaint also lists several other alleged promises under his promissory estoppel claim, but none of those are mentioned by Jowers in his response to the motion for summary judgment . . . . Accordingly, the Court grants MWK summary judgment on the promissory estoppel claim[.]"). The Court has also previously found that the Jowers Agreement is governed by Florida law. (Dkt. 87, at 10 n.7) ("[T]he Court looks to Florida law to interpret and apply the Jowers Employment Agreement."). Further, Jowers himself has argued throughout this litigation that Florida law should apply to the Jowers Agreement. (Dkt. 84, at 29) ("The Jowers Employment Agreement is governed by Florida Law."); (Dkt. 289, at 8) (noting the "public policy limits on Texas jurists interpreting Florida law regarding non-competes."). Therefore, the Court finds that Florida law applies to the Jowers Agreement. (P-2, Dkt. 341-1, at 8) ("This Agreement,

Exhibit 1 to Original Complaint                    Page 29 of 44

and any controversies, claims, disputes, or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Florida.'").

Under Florida law, "a contract providing restrictions on competition must involve a legitimate business interest as defined by statute to be enforceable." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So.3d 774, 779 (Fla. 2017); see also Fla. Stat. § 542.335(1)(b). Restrictive covenants are enforceable if (1) they are reasonable in time, area, and line of business; set forth in a writing signed by the party against whom enforcement is sought; and are reasonably necessary to protect that interest; and (2) the contractually specified restraint is supported by at least one legitimate business interest justifying the restraint. *See* Fla. Stat. § 542.335(1); *Env'l Servs., Inc. v. Carter*, 9 So. 3d 1258, 1263 (Fla. 5th Dist. Ct. App. 2009). Legitimate business interests include: (1) trade secrets, (2) valuable confidential business or professional information that otherwise does not qualify as trade secrets; (3) substantial relationships with specific prospective or existing customers, patients, or clients business; (4) customer, patient, or client goodwill; or (5) extraordinary or specialized training. Fla. Stat. § 542.335(1)(b). A person seeking enforcement of a restrictive covenant bears the initial burden to establish a prima facie case that the restraint is reasonably necessary. *Id.* § 542.335(1)(c). The burden then shifts to the person opposing enforcement to show that the restraint is overbroad or not reasonably necessary. *Id.* The court must then "modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." *Id.*

The Court finds that MWK has articulated legitimate business interests justifying the restrictive covenant. The Court has already found that the confidential information Jowers garnered about candidates through his role at MWK constitutes trade secrets. *See* Fla. Stat. § 542.335(1)(b). And, indeed, what constitutes a "legitimate business interest" under Florida law includes more than trade secrets. *Id.* (noting that legitimate business interests include "confidential business or professional information," "substantial relationships with specific" customers, and customer

Exhibit 1 to Original Complaint                    Page 30 of 44

goodwill). Thus, the Court also finds that the restrictive covenant's restraint on Jowers providing personnel placement services for 12 months after termination to candidates and clients he had "contact with" in the year before termination serves a legitimate business interest, as those contacts and associations helped form the basis of MWK's valuable relationships and goodwill with its clients and candidates.

On the other hand, the Court finds that the restrictive covenant's language precluding services to clients or candidates Jowers had "knowledge of" or "access to" in the twelve months preceding his termination is overbroad. A person seeking enforcement of a restrictive covenant bears the initial burden to establish a prima facie case that the restraint is reasonably necessary. *Id.* § 542.335(1)(c). In his testimony, Kinney states that Jowers would have had knowledge of or access to potential clients and candidates as a "result of [Kinney] having sent him a candidate list or client lists, having sent him leads." (Tr. I, at 189). However, MWK failed to produce evidence or testimony that demonstrates how Jowers's mere knowledge of or access to potential candidates or clients was confidential information, or how it furthered its stated business interest of establishing goodwill and relationships with existing and prospective clients and candidates. (P-2, Dkt. 341-1, at 4; Tr. I, at 87). Indeed, as Kinney testified, "[t]he recruiter's job is to develop relationships with law firms and candidates." (*Id.* at 14). Knowledge of or access to potential clients and candidates offers the possibility of eventually establishing a relationship, but MWK provided no evidence that the possibility of eventually establishing a relationship rises to the level of a legitimate business interest, such as "*substantial relationships* with specific" customers. *Id.* § 542.335 (emphasis added); *see also Vital Pharm., Inc. v. Alfieri*, No. 20-14217, 2022 U.S. App. LEXIS 1771, at *18–19 (11th Cir. Jan. 20, 2022) ("A party seeking enforcement of a restrictive covenant cannot rely on customer relationships as a legitimate interest unless the party "plead[s] and prove[s]" the identity of specific customers and the *substantiality of the relationship* with those customers.") (emphasis added).

Exhibit 1 to Original Complaint                    Page 31 of 44

Where, as here, the provisions of a restrictive covenant are unreasonable, the correct procedure is for the Court to modify, or "blue pencil," the agreement and award an appropriate remedy. *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1227 (M.D. Fla. 2012) (citing Fla. Stat. § 542.335(1)(c) ("If a contractually specified restraint is overbroad, overlong, or otherwise not necessary to protect the legitimate business interest or interests, a court *shall* modify the restraint and grant only the relief necessary to protect such interest or interests) (emphasis added). As a result, the Court finds that Jowers did not breach the Jowers Agreement when he provided personnel placement services to Baker & McKenzie and Gunderson Dettmer in the years after his termination, as the trial evidence does not demonstrate that Jowers had contact with those firms in the 12 months preceding his termination. (P-20, Dkt. 341-1, at 112–21; *id.* at 133–37).

The Court finds the restrictive terms in the Jowers Agreement are not overbroad in geographic area, overlong because of the tolling requirement, or unconscionable because they "purport to restrain Defendant's ability to earn a living worldwide for an indefinite period of time." (Dkt. 237, at 34–36); *see* Fla. Stat. § 542.335(1)(g)(1) ("In determining the enforceability of a restrictive covenant, a court ... [s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought.") (emphasis added). The Court finds that the restrictive covenant's worldwide geographic scope is reasonably necessary to protect MWK's legitimate business interest in building and maintaining relationships with clients and candidates and keeping the information gathered from those relationships confidential. Evidence presented at trial establishes that many of the placements Jowers made both before and after leaving MWK were international. (*See* Tr. II, at 171) (Jowers testifying that he "thought as a byproduct of being known as the Asia experts and the branding where [MWK was] international . . . [he] could make these deals happen like from the U.S. to Asia . . . . [MWK] also can do the basic New York placements"). In addition, the one-year period during which Jowers was restricted was reasonable.

Exhibit 1 to Original Complaint                    Page 32 of 44

Fla. Stat. § 542.335(1)(e) ("In determining the reasonableness in time of a postterm restrictive covenant predicated upon the protection of trade secrets, a court shall presume reasonable in time any restraint of 5 years or less and shall presume unreasonable in time any restraint of more than 10 years. All such presumptions shall be rebuttable presumptions.").

Finally, the Court finds that the tolling clause was likewise reasonable. After trial on the merits, such clauses are routinely enforced in courts applying Florida law. *See, e.g., Proudfoot Consulting v. Gordon*, 576 F.3d 1223, 1232 (11th Cir. 2009) (affirming the district court's holding that a "breach could be used to toll the six-month restrictive period even if that breach was not intentional"). Another recent Eleventh Circuit case applying Florida law considered the tolling clause unremarkable, holding, "To be sure, the employment agreements toll the duration of the twelve-month-long non-compete and employee non-solicitation covenants for as long as 'the [e]mployee is found to have been in violation of such restriction[s].'" *Vital Pharm.*, 2022 U.S. App. LEXIS 1771, at *11. In addition, MWK is not seeking damages beyond any accrued after April 13, 2021, (Pl. Br., Dkt. 342, at 82), approximately four and a half years after Jowers's termination, and thus less than the five years presumed reasonable under Florida's statutes. *See* Fla. Stat. § 542.335(1)(e). While the Jowers Agreement's tolling provision could result in a restrictive covenant that lasted indefinitely— which would be presumptively unreasonable under Florida law—MWK is not seeking damages beyond five years. The Court does not offer an opinion on the validity of the restrictive covenant were MWK to seek damages beyond five years.

The Court likewise finds that Jowers has not met his burden to establish that he signed the Jowers Agreement under duress. Under Florida law, in order to prove duress, "it must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side." *City of Miami v. Kory*, 394 So.2d 494 (Fla. 3d DCA 1981). "Threatened

Exhibit 1 to Original Complaint                    Page 33 of 44

action cannot constitute duress, when there are adequate legal remedies available with which to challenge it." *Id.* (citing *Hartsville Oil Mill v. United States*, 271 U.S. 43 (1926)). Jowers had the opportunity to review and negotiate the Jowers Agreement. (P-17, Dkt. 341-1, at 97; Trans. II, at 179–82 (Jowers describing discussions with Kinney); Trans. I, at 84–85). While Jowers asserted that Kinney threatened not to pay Jowers his commissions unless he signed the Jowers Agreement, there were "adequate legal remedies available" to Jowers to challenge the alleged withholding of his commissions—indeed, one of Jowers's counterclaims in this lawsuit is for unpaid commissions. (Deft. Br., Dkt. 343, at 20). Aside from the alleged withholding of his commissions, Jowers articulated no other coercive conduct by MWK. (*See* Tr. II, at 96) (Jowers testifying "I have free will . . . I wasn't physically threatened. I signed it and yeah. I did.").

Next, the Court finds that MWK did not materially breach the Jowers Agreement. Jowers objected to certain modifications of his commission rates and testified that he believes the changes to be unfair, (*see* P-158, Dkt. 341-4, at 1119; Tr. II, at 196). He also argues that Section 14.1 of the Jowers Agreement, which requires that modifications to the Agreement be "in a writing signed by the party to be charged," means that the subsequent modifications to his commission rates were violations of the contract's writing requirement. (Deft. Br., Dkt. 343, at 9) (citing Tr. II, at 189). This argument is unavailing. "Modifications to contracts are permitted despite provisions that all modifications must be in writing 'when one party provides additional consideration for the modification accepted by the other party.'" *Coral Reef Drive Land Dev., LLC v. Duke Realty Ltd. P'ship*, 45 So.3d 897, 902 (Fla. 3d DCA 2010); *see also Rhodes v. BLP Assocs., Inc.*, 944 So.2d 527, 530 (Fla. 4th DCA 2006) ("A written agreement may be modified by the subsequent conduct or course of dealing of the parties," provided the modification is by "mutual consent[] and supported by consideration."). Jowers's employment contract was an at-will contract. (P-2, Dkt. 341-1, at 8). In Florida, "it is well settled" that "continued employment constitutes adequate consideration to

34

Exhibit 1 to Original Complaint                    Page 34 of 44

support" a change to "a terminable at will contract of employment." *Coastal Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. Dist. Ct. App. 1992) (finding that an at-will employee's continued employment constituted consideration for a non-compete agreement that was imposed after the employee began working). The parties do not dispute that Jowers continued his at-will employment following each modification to his commission structure. In addition, if Jowers considers MWK's modifications of the Jowers Agreement to constitute breaches of the contract, he may now be deemed to have acquiesced to those changes. *See Acosta v. Dist. Bd. of Trustees of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 229 (Fla. Dist. Ct. App. 2005) ("Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.").

Finally, the Court finds that Jowers's challenge to the liquidated damages clause falls short. While the Court has previously held that Jowers waived his right to challenge the liquidated damages clause, (*See* Dkt. 285, at 21–22), Jowers challenges the award of damages by arguing that there is no evidence MWK would have made the placements Jowers made after leaving MWK. *See supra* Part II.B. However, MWK need not make this showing to receive damages for breach of contract. "The court determines the parties' intent from the four corners of the contract and only considers extrinsic evidence to explain or clarify ambiguous or unclear language. The court finds no ambiguity in the liquidated damages provision." *U.S. ex rel. James B. Donaghey, Inc. v. Dick Corp.*, No. 3:08CV56 MCR MD, 2010 WL 4666747, at *4 n.15 (N.D. Fla. Nov. 9, 2010) (citing *Taylor v. Taylor*, 1 So.3d 348, 350 (Fla. 1st DCA 2009); *Ospina–Baraya v. Heiligers*, 909 So.2d 465, 472 (Fla. 4th DCA 2005)). The liquidated damages clause at issue in this case does not require MWK to demonstrate it would have made the same placements. Instead, it is triggered by Jowers providing personnel placement services to clients and candidates in the year following his termination that he had contact with in the year prior to his termination. (P-2, Dkt. 341-1). Jowers assists with every placement made at his

Exhibit 1 to Original Complaint                    Page 35 of 44

recruiting firm. (Trans. II, at 128–30). Further, MWK provided evidence at trial that Jowers or his firm provided personnel placement services to several candidates and clients in violation of the restrictive covenant's terms. (*See supra* Part II.B). Because the Court has found the Jowers Agreement to be a valid contract, it will rely on the terms of the liquidated damages clause to assess damages and declines to consider the extraneous requirements that Jowers proposes.

The Court turns next to damages for breach of the Jowers Agreement. As the Court has found the liquidated damages clause to be valid, the Court will award MWK the amount of the placement fees Jowers made via each breach of the Jowers Agreement identified in Part II.B.[7] Accordingly, the Court will award damages in the following amounts:

| Candidate Name | Damages |
|---|---|
| Zhu | $0.00 |
| Chang | $0.00 |
| Ding | $0.00 |
| Kang | $0.00 |
| Wang | $0.00 |
| Usukumah | $0.00 |
| Cooper | $232,500 USD (P-124, Dkt. 341-4, at 615) |
| Patel | 3,170,352 HKD ($404,232.11 USD) (P-124, Dkt. 341-4, at 613) |
| Weber | $56,000 USD (P-121, Dkt. 341-4, Dkt. 578) |
| Ma | $45,000 USD (P-96, Dkt. 341-3, at 100) |
| Xu | 427,900 HKD ($54,525.53 USD) (P-127, Dkt. 341-4, at 666) |
| Su | 1,960,360 HKD ($250,029.97 USD) (P-130, Dkt. 341-4, at 728) |
| Singh | 3,045,767 HKD ($389,016.66 USD) (P-131, Dkt. 341-4, at 763) |

---

[7] With two exceptions: First, the Court will not award damages for the placements of Kang, Usukumah, Chang, Ding, Zhu, and Wang, as the Court declines to impose double damages, and Plaintiff does not seek double damages, (Pl. Br., Dkt. 342, at 50); and second, the Court will not award damages for the placements made at Baker & McKenzie and Gunderson Dettmer, as the Court found no evidence in the record that Jowers contacted these firms during his last year at MWK. (P-20, Dkt. 341-1, at 112–21; *id.* at 133–37).

Exhibit 1 to Original Complaint                    Page 36 of 44

| Firm Name | Placement |
|---|---|
| Weil, Gotshal & Manges | 351,528 HKD ($45,070.58 USD) (P-134, Dkt. 341-4, at 807)<br>368,870 HKD ($47,581.39 USD) (P-134, Dkt. 341-4, at 808) |
| Allen & Overy | $80,729 USD (P-121, Dkt. 341-4, 579) |
| Cleary, Gottlieb, Steen & Hamilton | 351,264 HKD ($45,009.61 USD) (P-123, Dkt. 341-4, at 602) |
| Cooley | $81,250 USD (P-124, Dkt. 341-4, at 614)<br>$28,000 USD (P-124, Dkt. 341-4, at 616) |
| DLA Piper | $125,000 USD (P-126, Dkt. 341-4, at 646) |
| Gibson, Dunn & Crutcher | 597,037.50 HKD ($76,446.24 USD) (P-127, Dkt. 341-4, at 657)<br>$55,000 USD (P-127, Dkt. 341-4, at 672)<br>371,925 HKD ($47,438.81 USD) (P-127, Dkt. 341-4, at 658) |
| Morrison & Foerster | 459,463 HKD ($58,757.86 USD) (P-132, Dkt. 341-4, at 775)<br>428,450 HKD ($54,851.43 USD) (P-132, Dkt. 341-4, at 777)<br>431,524.35 HKD ($54,975.46 USD) (P-132, Dkt. 341-4, at 777)<br>814,437 HKD ($103,805.48 USD) (P-132, Dkt. 341-4, at 779)<br>180,000 HKD ($22,977.35 USD) (P-132, Dkt. 341-4, at 782) |
| Skadden, Arps, Slate, Meagher & Flom | 353,194 HKD ($45,022.69 USD) (P-133, Dkt. 341-4, at 729)<br>$47,095 USD (P-133, Dkt. 341-4, at 794)<br>$47,500 USD (P-133, Dkt. 341-4, at 795) |
| Latham & Watkins | 458,250 HKD ($58,570.53 USD) (P-130, Dkt. 341-4, at 726)<br>353,194 HKD ($45,022.69 USD) (P-130, Dkt. 341-4, at 729)<br>353,239 HKD ($45,028.43 USD) (P-130, Dkt. 341-4, at 728)<br>78,249.50 HKD ($10,001.34 USD) (P-130, Dkt. 341-4, at 727)<br>$55,000 USD (P-130, Dkt. 341-4, at 729) |
| Kirkland & Ellis | 507,747 HKD ($65,007.43 USD) (P-129, Dkt. 341-4, at 705)<br>158,232 HKD ($20,279.65 USD) (P-129, Dkt. 341-4, at 706) |
| Linklaters | 646,230 HKD ($82,586.36 USD) (P-131, Dkt. 341-4, at 761)<br>379,698 HKD ($48,388.28 USD) (P-131, Dkt. 341-4, at 754)<br>62,224.80 SD ($46,089.91 USD) (P-131, Dkt. 341-4, at 758)<br>250,010 HKD ($31,884.56 USD) (P-131, Dkt. 341-4, at 760)<br>603,510.60 HKD ($77,167.37 USD) (P-131, Dkt.341-4, at 756) |

The total damages for MWK's claim of breach is $3,082,841.72. In addition, the Court will

award MWK reasonable attorney fees. The Jowers Agreement states that "[t]he Employee shall

---

[8] The Court used the date the placement fee was made for the purposes of calculating damages. If that date
was not in evidence, the Court used the date the candidate was hired.

Exhibit 1 to Original Complaint                    Page 37 of 44

indemnify and save the company harmless from all claims, demands, and actions arising out of the Employee's breach of this Agreement, and shall reimburse the Company for all costs, damages and expenses, including reasonable attorney's fees which the Company pays or becomes obligated to pay by reason of such activities or breach." (P-2, Dkt. 341-1, at 8). Under Florida law, a trial court has no discretion to decline to enforce an attorney fees provision in an underlying contract at issue in a suit; a contractual attorney fees clause must be enforced absent compelling circumstances. *In re Ranch House Motor Inn Intern., Inc.*, 335 B.R. 894 (Bankr. M.D. Fla. 2006); *Land & Sea Petroleum, Inc. v. Business Specialists, Inc.*, 53 So.3d 348 (Fla. 4th DCA 2011); *Point East Four Condominium Corp., Inc. v. Zevuloni & Assocs., Inc.*, 50 So.3d 687 (Fla. 4th DCA 2010); *M.A. Hajianpour, M.D., P.A. v. Khosrow Maleki, P.A.*, 975 So.2d 1288 (Fla. 4th DCA 2008). The Court will therefore award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence.

### C.  Loan Agreements

#### 1. 2012 Forgivable Loan

Under Texas law, a plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 324 (Tex. App. 2011) (citing *Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14th Dist.] 1994, no writ). The parties do not dispute that the Forgivable Loan contains a promissory note and, while Jowers objects to the assignments of the Forgivable Loan, the Court finds that Plaintiff is the legal owner and holder of the note. (*See infra* Part III.C.3). Further, the trial evidence demonstrates that Jowers is the maker of the promissory note. (P-5, Dkt. 341-1, at 22). Finally, Jowers does not dispute that when he left MWK in December 2016, the balance of the Forgivable Loan was $25,982.18 with a

Exhibit 1 to Original Complaint                                    Page 38 of 44

1.17 percent simple interest per annum. (Tr. II, at 100). Thus, MWK has proven all essential elements for recovery on a promissory note.

While Jowers contends that the loan should have been considered a bonus, (Tr. II, at 99), he provides no evidence or legal support for the contention that a bonus cannot be structured as a forgivable loan. Jowers testified that he "was expecting a bonus that day but it was -- yes, it switched on me." (Tr. II, at 95–97). Jowers also testified that he has free will and wasn't physically threatened to sign the loan agreement. (*See* Tr. II, at 96). The Court also cannot conclude that the trial evidence supports a finding of duress. Under Texas law, "A common element of duress in all its forms (whether called duress, implied duress, business compulsion, economic duress or duress of property) is improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and does interfere with another person's exercise of free will and judgment." *Dallas County Community College v. Bolton*, 185 S.W.3d 868, 878–79 (Tex. 2005). "To meet his burden on his affirmative defense, Jowers had to establish that MWK threatened to do an act that it had no legal right to do." *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 707 (Tex. App. 2014). The Court finds that giving Jowers a forgivable loan when Jowers was expecting a bonus does not constitute unlawful conduct or a threat; Jowers could still choose whether or not to sign a forgivable loan agreement. Further, the evidence shows that Kinney provided Jowers the loan as an "extra reward", (P-37, Dkt. 341-1, at 473), indicating that Jowers was not owed the money he received under the loan agreement, and therefore was at liberty to reject terms that he found unfavorable without the fear of losing money that was due to him. Finally, Jowers failed to testify or direct the Court to any evidence supporting his assertion that MWK materially breached the Forgivable Loan contract, nor did he mention this defense in his post-trial briefing. The Court therefore declines to rule in Jowers's favor on that basis.

As the Court finds that MWK has proven the necessary elements to recover under the Forgivable Loan agreement, the Court will award damages in the amount of $25,982.18 plus an

Exhibit 1 to Original Complaint                    Page 39 of 44

interest of 78.7 cents per day beginning on December 6, 2021. (Pl. Br., Dkt. 342, at 72; Tr. II, at

100). Therefore, the total that shall be awarded in damages under the Forgivable Loan is $25,982.18

plus $222.72 in interest for a total of $26,204.90 in damages. Further, an award of reasonable

attorney fees is mandatory under § 38.001(8) of the Texas Civil Practices and Remedies Code if the

plaintiff recovers damages for a breach of contract claim. *See* Tex. Civ. Prac. & Rem.

Code § 38.001(8); *Plains Cotton Coop. Ass'n v. Gray*, 672 F. App'x 372, 377 (5th Cir. 2016)

(quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002)); *In re Deepwater Horizon*, 807 F.3d

689, 699 n.10 (5th Cir. 2015); *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 421 (5th Cir.

2006); *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015). The Court will award reasonable attorney

fees to MWK in an amount to be determined upon presentation of attorney fee evidence.

### 2. 2012 Revolving Loan

The Court's analysis on the Revolving Loan parallels its analysis on the Forgivable Loan. A

plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a

breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal

owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'"

*McLernon*, 347 S.W.3d at 324. The parties do not dispute that the Revolving Loan contains a

promissory note and, while Jowers objects to the assignments of the Revolving Loan, the Court

finds that Plaintiff is the legal owner and holder of the note. (*See infra* Part III.C.3). Further, the trial

evidence demonstrates that Jowers is the maker of the promissory note. (P-9, Dkt. 341-1, at 30).

However, the parties dispute whether there was a balance due on the promissory note at the time of

Jowers's resignation. Jowers provided evidence that MWK's accountant Sommers told him she

thought "the remaining regular bonus and Hui Xu commission will just cover the remaining balance,

might be a few hundred short." (P-51, Dkt. 341-2, at 1). However, according to Kinney's testimony

and the accounting provided by MWK, as of January 2017, the amount due on the loan was

Exhibit 1 to Original Complaint                    Page 40 of 44

$8,001.84. (P-165, Dkt. 341-1, at 1131; Tr. I, at 176–78).

Payment is an affirmative defense, meaning the burden of proof rests on the Defendant. *United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 629–30 (5th Cir. 1992). Jowers has not offered his own accounting of the Revolving Loan, and instead asserts that he cannot owe the amount MWK claims because Sommers told him "*I think* [you] might be a few hundred short." (P-51, Dkt. 341-2, at 1) (emphasis added). However, as this Court noted at the summary judgment stage, "Sommers provides accounting and bookkeeping services for MWK but does not have the power to enter into contracts for MWK." (Dkt. 285, at 17). The trial evidence supports this—Kinney testified that Sommers was an "outside CPA, bookkeeper who worked as an independent contractor, 1099," and that she was not authorized to contract on behalf of MWK. (Tr. I, at 184). The Court finds that Sommers's statement, without more, is insufficient for Jowers to meet his burden of proof that he had paid off the Revolving Loan when he left Kinney. In light of MWK's accounting of the loan showing that Jowers owed $8,001.84 in January 2017, (*Id.* at 176–78; P-165, Dkt. 341-4, at 1131), the Court finds that MWK has met its obligation to show that "a certain balance is 'due and owing.'" *McLernon*, 347 S.W.3d at 324. MWK's testimony and accounting, which Jowers has not rebutted with an accounting of his own, likewise demonstrates that the $30,000 interest-free loan was not converted into the Revolving Loan, but was instead paid off using money withheld from Jowers's last paycheck. (Tr. II, at 6; P-165, Dkt. 341-1, at 1131).

Finally, as with the Forgivable Loan, the Court finds that Jowers was not under duress when he signed the loan agreement, as Jowers provided no evidence MWK threatened to do an act that it had no legal right to do" in order to get Jowers to sign the loan agreement. *Lujan*, 433 S.W.3d at 707. Additionally, Jowers failed to testify or direct the Court to any evidence supporting his assertion that

Exhibit 1 to Original Complaint                    Page 41 of 44

MWK materially breached the Revolving Loan contract, nor did he mention this defense in his post-trial briefing. The Court therefore declines to rule in Jowers's favor on that basis.

As the Court finds that MWK has proven the necessary elements to recover under the Revolving Loan agreement, the Court will award damages in the amount of $14,690.04 plus interest growing a $3.78 per day since December 6, 2021. (*Id.* at 176–78; P-165, Dkt. 341-4, at 1131). Therefore, the total that shall be awarded in damages under the Forgivable Loan is $14,690.04 plus $1069.74 in interest for a total of $15,759.78 in damages. Further, an award of reasonable attorney fees is mandatory under § 38.001(8) of the Texas Civil Practices and Remedies Code if the plaintiff recovers damages for a breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8); *Plains Cotton Coop. Ass'n*, 672 F. App'x at 377. The Court will award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence.

### 3. Choice of Law and Assignment of Employment and Loan Agreements

The Court finds that the Jowers Agreement, Forgivable Loan, and Revolving Loan were all validly assigned. Jowers did not cite any law in support of his contention that the assignment of the agreements renders them invalid. (Deft. Br., Dkt. 343, at 20). The Jowers Agreement and Revolving Loan specifically state that they permit assignments, and the Forgivable Loan does not prohibit assignments. Jowers had notice that the Jowers Agreement was assigned through his W-2s. Further, Courts in Texas have found that debtors have adequate notice of assignments when the amount due is assigned and payment is made to the assignee. *Fed. Deposit Ins. Corp. v. Registry Hotel Corp.*, 639 F. Supp. 812, 814 (N.D. Tex. 1986). The parties do not dispute that Jowers continued using and receiving credits under his loans after each assignment, and Jowers testified that he received accountings each month. (Tr. II, at 102). Therefore, the Court finds that the agreements were validly assigned and that MWK (which has merged with Counsel Holdings, Inc., (*see* tr. I, at 142)), is the successor in interest to the loan agreements.

42

Exhibit 1 to Original Complaint                    Page 42 of 44

### D.  Hui Xu Commission

The Court finds that Jowers was credited with the full value of his commission for the Hui commission on January 31, 2017 when MWK applied the commission to Jowers's balance under the Revolving Loan. (P-165, Dkt. 341-4, at 1131). Jowers has failed to provide his own accounting to demonstrate that he was not credited for the commission, nor does he direct the Court to any compelling testimony or evidence suggesting he was not credited with the commission in his post-trial briefs. (Deft. Br., Dkt. 343, at 14, 20).

### E.  Hong Kong Expenses

The Court declines to hold MWK liable for Jowers's housing expenses while in Hong Kong. The Jowers Agreement states that the company will pay all "usual and ordinary expenses," and Kinney testified that he has discretion to determine what expenses are usual and ordinary. (P-2, Dkt. 341-1, at 4; Tr. 239–42). While Jowers's August, September, and October 2016 housing expenses were charged to the Revolving Loan, the evidence demonstrates that this was because Jowers had already hit the limit on the $30,000 interest-free loan for that year. (D-327, Dkt. 341-8, at 24). The Court has already found that Jowers freely signed each of his loan agreements and therefore is subject to their limitations. (*See supra* Part III.C). Finally, the evidence demonstrates that MWK often reimbursed for non-housing business expenses. (P-36, Dkt. 341-1) (Jowers's paystubs showing $90,883.63 in expense reimbursements).

Exhibit 1 to Original Complaint                    Page 43 of 44

## IV. CONCLUSION

Based on the findings of fact and conclusions of law, the Court **AWARDS** the following

damages to MWK:

| | |
|---|---:|
| Misappropriation of Trade Secrets | $515,326.20 |
| Breach of Jowers Agreement | $3,082,841.72 |
| Forgivable Loan | $26,204.90 |
| Revolving Loan | $15,759.78 |
| **Total** | **$3,640,132.60** |

**IT IS FURTHER ORDERED** that the Court will award reasonable attorney fees to

MWK for breach of the Jowers Agreement, Forgivable Loan, and Revolving Loan in an amount to

be determined upon presentation of attorney fee evidence.

**IT IS FINALLY ORDERED** that post-judgment interest shall accrue beginning with the

day the judgment is filed with the Comptroller General. *See* 28 U.S.C. § 1961, 31 U.S.C. §

1304(b)(1)(A); *Transco Leasing Corp. v. United States*, 992 F.2d 552, 557 (5th Cir. 1993). The post-

judgment interest rate as of September 15, 2022 is 3.62% per annum. *See*

https://www.txwd.uscourts.gov/for-attorneys/post-judgment-interest-rates-weekly/.

A final judgment will be entered separately.

**SIGNED** on September 15, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

Exhibit 1 to Original Complaint                    Page 44 of 44